INTERSTATE COMMERCE COMMISSION ET AL. *v.* INLAND WATERWAYS CORP. ET AL.

No. 175. Argued January 11, 12, 1943.—Decided June 14, 1943.

*Mr. Daniel H. Kunkel*, with whom *Mr. Daniel W. Knowlton* was on the brief, for the Interstate Commerce Commission; *Mr. Frank H. Cole, Jr.*, with whom *Mr. Leo P. Day* was on the brief, for the Baltimore & Ohio Railroad Co. et al.; and *Messrs. Bryce L. Hamilton* and *A. B. Enoch* submitted for the Alton Railroad Co. et al.,—appellants.

*Mr. Nuel D. Belnap,* with whom *Messrs. Luther M. Walter* and *John S. Burchmore* were on the brief, for the Inland Waterways Corp. et al.; *Mr. Edward B. Hayes,* with whom *Mr. Luther M. Walter* was on the brief, for A. L. Mechling (doing business as A. L. Mechling Barge Line); and *Mr. W. Carroll Hunter,* with whom *Messrs. Robert H. Shields* and *James K. Knudson* were on the brief, for the Secretary of Agriculture of the United States,—appellees.

MR. JUSTICE JACKSON delivered the opinion of the Court.

By schedules filed with the Interstate Commerce Commission to become effective October 15, 1939, the appellant eastern railroads[1] sought to deny grain arriving at Chicago by barge over the Illinois Waterways the privilege of moving out of Chicago by rail on "proportional" rates applicable to competing grain arriving at Chicago by lake steamer or rail. The only other rates on which the ex-barge grain could move eastward by rail from Chicago were "local" rates, which were in all cases higher than the existing "proportional" rates. The proposed schedules were protested by barge lines and others desirous of maintaining the existing proportionals as to ex-barge grain.

Understanding of the controversy thus precipitated and the consequent litigation which has brought it to this Court requires a statement of the rather complicated rate structure to which the proposed schedules related.

The proposed schedules applied to grain, grain products and grain by-products, but for convenience we refer to them all as "grain." They dealt not only with grain com-

---

[1] Baltimore & Ohio Railroad Company, New York Central Railroad Company, New York, Chicago and St. Louis Railroad Company, Pennsylvania Railroad Company, Erie Railroad Company, and the Chesapeake & Ohio Railway Company.

ing by barge *via* the Illinois Waterways to Chicago, but also with grain so arriving at Peoria, Illinois, St. Louis, Missouri, and other related rate-break points. Chicago is illustrative of all, and for convenience we shall follow the practice employed by the parties in briefs and argument, and confine our discussion to it.

Grain originating at Chicago, grain brought there by truck, or by rail under intrastate rates, and grain which had forfeited its transit privileges, moved eastward by rail from Chicago on local rates. Their validity as such has not been questioned in this case.

Grain originating at certain places distant from Chicago had the privilege, however, of moving eastward from Chicago by rail on the lower proportional rates, although it came to rest at Chicago for marketing or processing. These "proportionals" varied according to the region of origin or the region of destination; and, in some instances, according to both.

"Official Territory" lies east of Chicago, and is divided into "Central Territory," "Trunk-line Territory," and "New England Territory." Central Territory lies west of a line drawn through Pittsburgh and Buffalo. To this territory there were three different sets of proportionals, set with reference to the territory of origin.

Grain originating at certain points in Illinois moved out of Chicago by rail to Central Territory on "Illinois Re-Shipping" proportionals, which, however, did not apply to ex-barge grain and were not affected by the proposed schedules.

Grain originating in "Northwest Territory" moved out of Chicago by rail to Central Territory on "Northwest" proportionals, which were in some instances higher, and in others lower, than the Illinois Re-Shipping proportionals. As first published, these proportionals applied only to grain originating in Northwest Territory, which comprises generally North Dakota, South Dakota, Minne-

sota, Wisconsin, the upper peninsula of Michigan, Montana, Wyoming, Idaho, Oregon, Washington, and certain Canadian provinces. The Northwest proportionals were originally and have continued to be applicable on grain arriving at Chicago by lake. In 1932 the Northwest proportionals were amended to make them apply to shipments which "arrived by boat line at Chicago . . ." At the time this wording was put into the tariffs the only water-borne grain to which they applied was that arriving from the Northwest by boat over the Great Lakes. The Commission has decided that the effect of this amendment was to make the Northwest proportionals apply to grain arriving by barge over the Illinois Waterways, which were opened in the following year, 1933; and we accept its determination of this issue. While shipping points along the Waterways vary from 57.5 to 200.9 miles in distance from Chicago, some grain arriving there by barge originated at points as far beyond as Kansas City and St. Louis. The Northwest proportionals were the only ones which applied to ex-barge grain moving out of Chicago by rail to Central Territory, and the proposed schedules cancelled them as to such grain.

Grain brought by rail from "Trans-Mississippi Territory," which included, among other places, Kansas City and St. Louis, moved out of Chicago to Central Territory on "Trans-Mississippi" proportionals, which had been set by the Commission 3 cents lower than the Northwest proportionals, in order to equalize the Twin Cities with Kansas City. The Trans-Mississippi proportionals did not apply to grain coming from these points by barge, and therefore such grain had to pay a higher rate for the outbound haul than was required of grain coming from them by rail. No complaint has been made, however, of this; and the appellees have been content to assert that they are entitled to the Northwest proportionals as to such grain.

"Trunk-line Territory" lies between Central Territory and New England Territory, which comprises the New England States. To Trunk-line and New England Territories the proportionals did not vary with the point of origin of the grain. These proportionals applied to grain coming to Chicago by barge over the Illinois Waterways, and the proposed schedules cancelled them as to such grain. The existing schedules provided that "in no case shall the combination through rate to and from the re-shipping point *via* rail be less than the local rate from the re-shipping point to destination, the difference necessary to protect the local rate from the re-shipping point to be added to the re-shipping rate therefrom." No such provision was made with respect to the barge-rail traffic, and the Commission found accordingly that "the barge-rail rates are far below the local rates from the re-shipping points in contravention of the fourth-section rule,[2] while the all-rail rates are in strict conformity with that rule."

---

[2] § 4. "(1) It shall be unlawful for any common carrier subject to this part or part III to charge or receive any greater compensation in the aggregate for the transportation of passengers, or of like kind of property, for a shorter than for a longer distance over the same line or route in the same direction, the shorter being included within the longer distance, or to charge any greater compensation as a through rate than the aggregate of the intermediate rates subject to the provisions of this part or part III, but this shall not be construed as authorizing any common carrier within the terms of this part or part III to charge or receive as great compensation for a shorter as for a longer distance: *Provided,* That upon application to the Commission such common carrier may in special cases, after investigation, be authorized by the Commission to charge less for longer than for shorter distances for the transportation of passengers or property; and the Commission may from time to time prescribe the extent to which such designated common carrier may be relieved from the operation of this section, but in exercising the authority conferred upon it in this proviso the Commission shall not permit the establishment of any charge to or from the more distant point that is not reasonably compensatory for the service performed; and no such authorization shall be granted on account of merely potential water

When the proposed schedules were filed with the Commission, that body, acting pursuant to its authority under § 15 (7) of the Act,[3] suspended them for the allowable

competition not actually in existence: *And provided further,* That tariffs proposing rates subject to the provisions of this paragraph may be filed when application is made to the Commission under the provisions hereof, and in the event such application is approved, the Commission shall permit such tariffs to become effective upon one day's notice." 54 Stat. 904, 49 U. S. C. § 4 (1).

[3] 44 Stat. 1447 as amended by 54 Stat. 912, 49 U. S. C. § 15 (7), reading:

"Whenever there shall be filed with the commission any schedule stating a new individual or joint rate, fare, or charge, or any new individual or joint classification, or any new individual or joint regulation or practice affecting any rate, fare, or charge, the commission shall have, and it is hereby given, authority, either upon complaint or upon its own initiative without complaint, at once, and if it so orders without answer or other formal pleading by the interested carrier or carriers, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, fare, charge, classification, regulation, or practice; and pending such hearing and the decision thereon the commission, upon filing with such schedule and delivering to the carrier or carriers affected thereby a statement in writing of its reasons for such suspension, may from time to time suspend the operation of such schedule and defer the use of such rate, fare, charge, classification, regulation, or practice, but not for a longer period than seven months beyond the time when it would otherwise go into effect; and after full hearing, whether completed before or after the rate, fare, charge, classification, regulation, or practice goes into effect, the commission may make such order with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made within the period of suspension, the proposed change of rate, fare, charge, classification, regulation, or practice shall go into effect at the end of such period; but in case of a proposed increased rate or charge for or in respect to the transportation of property, the commission may by order require the interested carrier or carriers to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require the interested carrier or carriers to refund, with interest, to the persons in whose

period of seven months and entered upon a hearing of their lawfulness. The last testimony was heard, and the record in the case closed, on January 26, 1940. On September 18, 1940, the President approved the Transportation Act of 1940.[4] Thereafter the appellee Inland

behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a change in a rate, fare, charge, or classification, or in a rule, regulation, or practice, after September 18, 1940, the burden of proof shall be upon the carrier to show that the proposed changed rate, fare, charge, classification, rule, regulation, or practice is just and reasonable, and the Commission shall give to the hearing and decision of such questions preference over all other questions pending before it and decide the same as speedily as possible."

[4] The provisions of the Interstate Commerce Act particularly relied upon by appellees which were amended or added by the Transportation Act of 1940 read as follows:

"It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy." 54 Stat. 899.

"§ 3 (1). It shall be unlawful for any common carrier subject to the provisions of this part to make, give, or cause any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic, in any respect whatsoever; or to subject any particular person, company, firm, corporation, association, locality, port, port district, gate-

Waterways Corporation requested the Commission to dispose of the proceeding in the light of the new Act. On July 31, 1941, Division 2 of the Commission found that "the proportional rates here in issue have never been applicable on this barge traffic moving on unfiled rates," and that "the schedules under suspension are not shown to be unlawful." It announced that an order would be entered vacating the already expired order of suspension and discontinuing the proceedings.[5] When the period of compulsory suspension ended, the carriers had voluntarily continued the suspension.

In its petition for rehearing and reconsideration of this report the Inland Waterways Corporation asserted that the Commission had permitted discrimination against a connecting line forbidden by § 3 (4) of the Interstate

way, transit point, region, district, territory, or any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever: *Provided, however,* That this paragraph shall not be construed to apply to discrimination, prejudice, or disadvantage to the traffic of any other carrier of whatever description." 54 Stat. 902, 49 U. S. C. § 3 (1).

"§ 3 (4). All carriers subject to the provisions of this part shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines and connecting lines, and for the receiving, forwarding, and delivering of passengers or property to and from connecting lines; and shall not discriminate in their rates, fares, and charges between connecting lines, or unduly prejudice any connecting line in the distribution of traffic that is not specifically routed by the shipper. As used in this paragraph the term 'connecting line' means the connecting line of any carrier subject to the provisions of this part or any common carrier by water subject to part III." 54 Stat. 903, 49 U. S. C. § 3 (4).

"Part III, § 305 (c) . . . Differences in the classifications, rates, fares, charges, rules, regulations, and practices of a water carrier in respect of water transportation from those in effect by a rail carrier with respect to rail transportation shall not be deemed to constitute unjust discrimination, prejudice, or disadvantage, or an unfair or destructive competitive practice, within the meaning of any provision of this Act." 54 Stat. 935, 49 U. S. C. § 905 (c).

[5] 246 I. C. C. 353.

Commerce Act as amended by the Transportation Act of 1940.[6]  It suggested that the Commission fix the existing proportional rates as the proper ones, stating that: "Theoretically, the Commission is not limited to a choice between the unlawful proposed rates and the present rates, but may, upon an adequate record, prescribe some different basis of rates for the future.  Actually, no different proposal has been introduced which could support a different basis of rates than those presently in effect.  That fact, however, cannot possibly militate to justify the proposed rates, but could only compel the postponement of any change in the present tariffs pending further hearing, and the introduction of a lawful proposal." [7]

The decision of the whole Commission on reconsideration was announced on December 1, 1941.[8]  In it the Commission took official notice that certain of the protestant barge carriers had attained common carrier status under the Act, and stated that "no useful purpose would be served by further hearing or reargument." [9]  The Commission reviewed the existing rate structure and the probable effects of the proposed changes in operation as contrasted to the effects of denying them, and said:

"The proposed schedules will not prohibit the movement by barge-rail even to trunk-line territory, their prin-

---

[6] See footnote 4, *supra,* for the text of this provision.

[7] Petitions for reconsideration were also filed by "Chicago protestants," operating elevators and dealing in grain at Chicago; Illinois Agricultural Association, representing shippers located on the Illinois Waterways; Finnegan Warehouse Company, operating an elevator on the Waterways; and the United States Department of Agriculture. These petitions are not incorporated in the record, but it appears that the action of Division 2 was assailed by these protestants under § 3 (1), set out in footnote 4.

[8] 248 I. C. C. 307.

[9] From the report of the Commission it appears that the Inland Waterways Corporation was the only one asking further hearings. It stated that further hearings could be useful only to establish the information of which the Commission took official notice, and suggested that the Commission avoid the necessity for them by taking such notice.

cipal commercial effect being to reduce the profits of the Chicago elevator operators. . . .[10]

"Protestants maintain that the proposed schedules will be unreasonable, unjustly discriminatory, and unduly prejudicial . . . and unduly preferential. . . . This is based primarily on the fact that under the proposed schedules the ex-barge rates will be higher than the ex-rail or ex-lake rates, although in each instance the physical carriage beyond the reshipping point is substantially the same. But the latter is also true of local grain, grain brought in by truck, or by rail under intrastate rates, or grain which has forfeited its transit privileges. To adopt protestants' premise would mean that all proportional rates lower than local rates and differing from each other according to the origin of the commodity would have to be condemned. As pointed out by the division, reshipping or proportional rates are in their essence balances of through rates. Such balances are, of course, determined by the measure of the in-bound and through rates, and properly may vary according to the relative length and nature of the in-bound and through service. It follows that the protestants' allegations cannot be sustained in this proceeding, although in a proper proceeding we might prescribe proportional rates on the ex-barge traffic lower than local rates or joint barge-rail rates lower than the combinations.

"The facts of record, as detailed by the division and summarized herein, clearly show that respondents are justified under section 1 in treating the ex-barge traffic the same as local or ex-truck traffic and that the proposed

---

[10] Even under the proposed schedules, the combination barge-rail rates are in many instances lower than the all-rail rates. Much grain that arrives at Chicago is consumed locally or is shipped out by lake. In the case of grain arriving by rail, such disposition often leaves the elevator with a "transit balance" as a result of which ex-barge grain may move eastward by rail on the proportional rates.

The District Court apparently did not find that there was no evidence to support the Commission's finding that it was the elevator operator, rather than the farmer, who is affected by the proposed schedules. In any event, the foregoing would seem sufficient support for the Commission's finding, and we do not suppose that the finding makes any difference in the law to be applied.

schedules cannot be condemned as unlawful under sections 2 and 3 of the act.

"On reconsideration of the record in the light of the petitions and replies thereto and our prior decisions, we find that:

"(1) The proportional rates here under consideration were legally applicable on the ex-barge traffic where the so-called policing provisions were strictly complied with.

"(2) The proposed schedules are shown to be just and reasonable and are not shown to be otherwise unlawful."

Accordingly the Commission ordered:

"That the order heretofore entered in this proceeding, suspending the operation of the schedules enumerated and described in said order, be, and it is hereby, vacated and set aside as of December 22, 1941, and that this proceeding be discontinued."

After the Commission had announced its decision and on December 12, 1941, appellant Mechling Barge Lines sought to intervene on the ground that since the record had been closed it had become a regular common carrier by water of grain by barge to Chicago and other rate-break points, and was entitled to the protection afforded to such carriers by the Transportation Act of 1940. It urged that the decision be set aside and, if it should be thought necessary to this end, that it be given an opportunity to introduce evidence. This was the first offer to assist the Commission in any way in the establishment of proportional rates fixed with reference to the ex-barge grain. No specific suggestion was made, however, as to the amount of such rates or as to the evidence which would be introduced in support. This petition was denied by the Commission on January 21, 1942.

On January 16, 1942, the Inland Waterways Corporation had filed its complaint in the United States District Court seeking an injunction against the enforcement of the Commission's order. Various other parties were allowed to intervene in the case as plaintiffs and defend-

ants. The Attorney General did not participate, giving as his reason the existence of a conflict in litigation between coördinate.agencies of the Government, the Agricultural Adjustment Administration and the Interstate Commerce Commission. The opinion of the specially constituted three-judge District Court was announced on April 16, 1942.[11] It stated that "The Interstate Commerce Commission took no evidence addressed to the issue whether the rate proposal in question is in violation of Section 3 (4) of the Interstate Commerce Act, as amended by the Transportation Act of 1940, or contrary to the National Transportation Policy enacted by the last said act; but the Interstate Commerce Commission passed upon the legality of said rate proposal upon evidence taken without reference to such issues and before they existed." It concluded that the order was of a "character which this Court is authorized to enjoin and set aside," and should be set aside on the ground that it "discriminates against water competition by the users of barges." It decreed that the Commission's order vacating the already-expired suspension of the proposed schedules and discontinuing the proceedings be annulled and that the railroads be "permanently enjoined . . . from acting upon the authority of the aforesaid order."

The case is here on appeal.[12]

In the proceedings before the Commission the protestants pitched their case upon two propositions: (1) To deny the ex-barge grain the benefit of proportionals sought to be cancelled was necessarily unlawful since the physical carriage beyond Chicago was substantially the same, no matter where the grain originated; (2) Since denial of that benefit was necessarily unlawful, the Commission was

---

[11] 44 F. Supp. 368.

[12] Urgent Deficiencies Act of October 22, 1913, 38 Stat. 208, 220, 28 U. S. C. §§ 47, 47a; § 238 of the Judicial Code as amended, 28 U. S. C. § 345.

bound to maintain the *status quo* by cancelling the proposed schedules and thus perpetuating the existing rate structure, whatever might be its defects.

As the Commission correctly observed with reference to the first contention, "to adopt protestants' premise would mean that all proportional rates lower than local rates and differing from each other according to the origin of the commodity would have to be condemned."

Proportional rates so differing and lower than local rates for like outbound transportation have a long history, antedating the Interstate Commerce Act itself. Long hauls have generally been thought entitled to move at a rate less than the sum of the rates for local or short hauls between intermediate points. The practice of routing commodities such as grain to centers for marketing and processing has been widespread and often a necessary feature of the process of distribution. In many instances stopovers for marketing and processing have not been considered as disrupting the continuity of transportation to more distant points, and consequently the grain has been allowed to move on at a rate lower than the outbound rate on grain originating locally and not from a distance.[13] To get the outbound business competing carriers frequently would offer rates similarly computed.[14] Proportional rates established on this reasoning [15] have become deeply embedded in the transportation system of the country, and have been approved by the Interstate Commerce Commission,[16] by the federal courts, this one in-

[13] E. g., Unlawful Rates in Trans. Cotton by K. C., M. & B. R. R. Co., 8 I. C. C. 121; Central Yellow Pine Assn. *v.* V., S. & P. R. Co., 10 I. C. C. 193.

[14] Berry, A Study of Proportional Rates, 10 I. C. C. Practitioner's Journal 545, 602.

[15] For the variety of practices so sustained, see Locklin, Economics of Transportation (1935), pp. 122–123, 629–631.

[16] See the dissenting opinion of Chairman Eastman in the present case. Other cases are collected in Berry, *supra*, footnote 14.

cluded;[17] and, so far as it has spoken on the subject, by Congress itself.[18]   We see no reason for repudiating them now.

Having pointed out the error of the protestants' basic contention, the Commission stated that: "It follows that the protestants' allegations cannot be sustained in this proceeding, although in a proper proceeding we might prescribe proportional rates on the ex-barge traffic lower than local rates or joint barge-rail rates lower than the combinations."   Pending the commencement of such a proceeding it ordered the vacation of the already-expired order of suspension and ordered the discontinuance of the instant proceedings.

Despite this statement, much of the argument in this Court has proceeded upon the assumption that the Commission's order resulted from its belief and findings that the discrepancies between the proportional rates not cancelled in the proposed schedules and the local rates as applied to ex-barge grain were in all respects lawful, and that it actually approved or prescribed a rate structure containing such discrepancies.   We do not so understand the action of the Commission.

True, the Commission stated that the railroads "are justified under section 1 in treating the ex-barge traffic the same as local or ex-truck traffic," and found that "the proposed schedules are shown to be just and reasonable."   But this does not constitute a finding that the rates were lawful; they "may lie within the zone of reasonableness and yet result in undue prejudice" or otherwise violate the Act.[19]   The Commission also stated that the facts of record

[17] *Atchison, T. & S. F. Ry. Co.* v. *United States,* 279 U. S. 768; *Great Northern Ry. Co.* v. *Sullivan,* 294 U. S. 458; cf. *Board of Trade* v. *United States,* 314 U. S. 534.

[18] § 11 of the Panama Canal Act, 1912, 37 Stat. 566, now 49 U. S. C. § 6 (11), set out in its present form in footnote 25, *infra.*   Cf. Sen. Rept. No. 433, 76th Cong., 1st Sess., p. 10.

[19] *United States* v. *Illinois Central R. Co.,* 263 U. S. 515, 524.

show that "the proposed schedules cannot be condemned as unlawful under sections 2 and 3 of the act." [20] But this statement followed immediately upon the Commission's statement that from its conclusion that protestants' claim as a matter of right to the existing proportionals was erroneous, "It follows that the protestants' allegations cannot be sustained in this proceeding, although in a proper proceeding we might prescribe proportional rates on the ex-barge traffic lower than local rates or joint barge-rail rates lower than the combinations." Read in the context, we think it meant only that the proposed schedules could not be struck down upon the erroneous view advanced by the protestants. The finding of the Commission that the proposed schedules "are not shown to be otherwise unlawful" is, we think, to be similarly read. This form of finding has been held by the Commission not to constitute an approval or a prescription of the rates under suspension. [21] Since the Commission refused to approve or prescribe

---

[20] § 2, 49 U. S. C. § 2, reads as follows:

"If any common carrier subject to the provisions of this chapter shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect, or receive from any person or persons a greater or less compensation for any service rendered or to be rendered, in the transportation of passengers or property, subject to the provisions of this chapter, than it charges, demands, collects, or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is prohibited and declared to be unlawful."

The pertinent provisions of § 3 are set forth in footnote 4, *supra*.

[21] Standard Packing Co. *v.* Union Pacific R. Co., 190 I. C. C. 433; Parkersburg Rig & Reel Co. *v.* Chicago & N. W. Ry. Co., 198 I. C. C. 709; William Kelly Milling Co. *v.* Atchison, T. & S. F. Ry. Co., 211 I. C. C. 53; Kansas City Ice Co. *v.* Atchison, T. & S. F. Ry. Co., 215 I. C. C. 616, 619; Halifax Coal & Wood Co. *v.* Atlantic & Y. Ry. Co., 219 I. C. C. 594; Morehead Cotton Mills Co. *v.* Chesapeake & Ohio Ry. Co., 231 I. C. C. 437.

them, they stand only as carrier-made rates which, under the Commission's decisions, leaves them open to possible recovery of reparations.[22] Like the Commission, we also refrain from approving or prescribing them.

The case had been developed before the Commission upon the theory that the proposed schedules must stand or fall in their entirety. There has been no suggestion, nor is it apparent, that it would have been feasible for the Commission to pick and choose among the items in the existing and proposed schedules.

To perpetuate the existing rate structure by sustaining the District Court's injunction would entail numerous and serious violations of § 4 (1).[23] Under that rate structure, ex-barge grain moved from Illinois River points to Baltimore, New York and Boston at combination rates lower than the local rates for domestic grain from all points in Central Territory west of a line running south from Bay City, Michigan, through Fort Wayne and Indianapolis, Indiana. So also did the ex-barge grain move out at combination rates lower than local export rates on grain from all points in Central Territory west of a line running southwardly and south along the Indiana-Ohio line; and lower than the local export rates on corn from all points in Central Territory west of a line between Paynesville and East Liverpool, Ohio, near the Pennsylvania line. Unlike the barge-rail rate, the all-rail rates are, as the Commission has found, in strict conformity with § 4 (1). Congress by the Transportation Act of 1940 amended § 4 (1), but nowhere in the Act or in its legislative history is there any suggestion that from the mere fact that grain moving from beyond Chicago to New York travels by barge for the 60-mile leg of its journey to Chicago—less

---

[22] See cases cited in footnote 21, *supra*. Compare *Arizona Grocery Co.* v. *Atchison, T. & S. F. Ry. Co.*, 284 U. S. 370; 50 Yale Law Journal 714.

[23] See footnote 2, *supra*, for the text.

than one percent of the total haul—it shall as matter of law be entitled to a rate from beyond Chicago to the seaboard less than that from the Pennsylvania line to the seaboard.[24]

Appellees make no better showing with respect to the effect of the injunction on the rate structure west of Chicago. To sustain the injunction would require a holding that grain originating 60 miles from Chicago must as matter of law be given the benefit of proportionals fixed with reference to grain from the Northwest Territory, embracing points in Canada and as far west in the United States as Washington and the Dakotas. In addition to the disparity in distances, there is the further fact that the grain from the Northwest is predominately wheat, while that from the territory served by the barge lines is predominately corn from Illinois. Nothing in the Interstate Commerce Act as amended by the Transportation Act of 1940, or in the statements of even the most ardent Congressional champions of water transportation, affords the slightest warrant for a decision that the Commission must treat as legally identical such widely disparate factual situations.

Finally it is claimed that the Commission was obliged to continue the § 15 (7) proceedings and establish special proportionals for the barge lines under § 6 (11) of the Act.[25]

---

[24] Indeed, the legislative history shows that the water interests vigorously championed the long-and-short-haul clause as a measure necessary to prevent ruinous competition.

[25] § 6 (11) provides:

"When property may be or is transported from point to point in the United States by rail and water through the Panama Canal or otherwise, the transportation being by a common carrier or carriers, and not entirely within the limits of a single State, the Interstate Commerce Commission shall have jurisdiction of such transportation and of the carriers, both by rail and by water, which may or do engage

This duty is claimed by appellees to derive from the provision of § 15 (7) that after suspension and hearing of a proposed rate change the Commission "*may* make such order with reference thereto as would be proper in a proceeding initiated after it had become effective." (Italics supplied.) The construction contended for would have the effect either of imposing a practically impossible burden upon the Commission or of making resort to the Commission's powers under § 15 (7) so rare as to make such powers of little practical significance. Suspension cases are very numerous, and in many of them the construction contended for would require the Commission to "readjust the entire rate structure of an important section of the country." [26] We have already noted the breadth of the rate structure here involved. To require the present proceedings to be continued until proportionals can be set with reference to the barge transportation would hardly be within the intention of Congress, which in terms made the Commission's power discretionary, and legislated upon the assumption, formed after much experimentation with the period of suspension,[27] that suspension cases could nor-

in the same, in the following particulars, in addition to the jurisdiction otherwise given by this chapter:

". . . (b) To establish proportional rates or maximum, or minimum, or maximum and minimum proportional rates, by rail to and from the ports to which the traffic is brought, or from which it is taken by the water carrier, and to determine to what traffic and in connection with what vessels and upon what terms and conditions such rates shall apply. By proportional rates are meant those which differ from the corresponding local rates to and from the port and which apply only to traffic which has been brought to the port or is carried from the port by a common carrier by water." 49 U. S. C. § 6 (11).

[26] Salt from Louisiana Mines to Chicago, 69 I. C. C. 312, 313. See also, Livestock to Eastern Destinations, 156 I. C. C. 498.

[27] In the original form provided by § 12 of the Mann-Elkins Act, 1910, 36 Stat. 539, 552, the period of suspension was not to exceed

mally be carried to completion within seven months and to that end commanded in § 15 (7) that "the Commission shall give to the hearing and decision of such questions preference over all other questions pending before it and decide the same as speedily as possible."

The record had been closed on January 26, 1940, when the last testimony was heard. The Transportation Act of 1940 was not enacted until September 18. At the time the evidence was taken it was not clear whether some of the barge lines operating in the waterway were common carriers, and none had obtained certificates of convenience and necessity from the Commission as now required. They had not filed reports with the Commission from which the results of their own operations might be judged, and they had not filed tariffs showing their rates. All of this has since changed. The applicable law has changed. The issues raised by the position of the parties did not call

---

120 days, with the proviso that if the hearing could not be concluded within that period the Commission might in its discretion extend the time for a further period not exceeding six months. § 4 of the Commission Division Act, 1917, 40 Stat. 270, 272, provided that until January 1, 1920, Commission approval must be had for the filing of increased rates. By § 418 of the Transportation Act of 1920, 41 Stat. 456, 486, the initial suspension period of 120 days was retained, but the permissible period of further suspension was shortened to thirty days. "The increased size of the Commission and its divisional organization rendered the shortening of the suspension period feasible." 1 Sharfman, The Interstate Commerce Commission, 203. The Commission was authorized, however, to require the carrier to keep accurate account in detail of all amounts received by reason of an increase going into effect at the end of the period of suspension, and to require at the end of the hearing that they be refunded. The present provisions with regard to the Commission's power of suspension and of requiring an accounting were enacted by § 2 of the Mayton-Newfield Act, 1927, 44 Stat. 1446, 1447.

for a fixing of new combination rates, for it was contended barge grain was entitled to the existing proportionals.

The policy provisions of the Transportation Act of 1940, as well as the specific statutory provisions, provide only standards of considerable generality and some overlapping. It requires administration to "recognize and preserve the inherent advantages of each"—rail, water, and motor transport. It also seeks "sound economic conditions" for all kinds of transportation.[28]  For more than a year after the enactment of this Act, and until after the Commission had finally disposed of the case, appellees showed no disposition to make proposals or to develop a record upon the basis of which the Commission might prescribe rates in view of their particular circumstances and under the provisions of the Act designed with reference to them. Instead they relied upon the erroneous view that they were by law entitled to the fortuitous and in many respects unlawful benefits of the existing rate structure.  Their nearly four years of litigation have not, however, been in vain, for during all this time they have managed to keep the proposed schedules in abeyance—first by compulsory suspension for the allowable period of 7 months at the hands of the Commission, then by the railroads' voluntary act at the expiration of that period, and finally by the compulsion of the District Court's injunction.

Our function does not permit us either to prescribe or approve rates, and our decision carries no implication of approval of any rates here involved.  Nor are we at liberty to prescribe general attitudes the Commission must adopt towards the exercise of discretion left to it rather than to courts.  We decide only whether the Commission has acted within the power delegated to it by law.  We are of

---

[28] See footnote 4, *supra.*

opinion that it has and that the decision of the court below must be

*Reversed.*

Mr. Justice Rutledge did not participate in the consideration or decision of this case.

Mr. Justice Black, dissenting:

The issue in this case is whether the farmers and shippers of the middle west can be compelled by the Interstate Commerce Commission and the railroads to use high-priced rail instead of low-priced barge transportation for the shipment of grain to the east.  I agree that, in the words of Division 2 of the Commission, "this record is replete with complexities and technicalities" which have almost, but I think not quite, successfully obscured that simple issue.  The District Court, which held that the Interstate Commerce Commission's order "discriminates against water competition by the users of barges," understood the issue.[1]  The railroads, which proposed the increase in the cost to barge shippers, also understood the issue as is shown by the frank statement of their representative at the Commission hearing: "We made this proposal, as I have stated several times, and filed these tariffs with the hope that we could drive this business off of the water and back onto the rails where it belongs. . . . We are not in love with water transportation . . . and we believe that we are entitled to that grain business."  From behind a verbal camouflage of "complexities and technicalities" there emerges one single easily understandable question: Railroads pick up grain in Chicago which may be brought there by rail, lake transport, or inland waterway barge.  Is it lawful for a railroad to deprive midwestern grain farmers and shippers of the benefits of cheap barge transportation by charging a higher tariff for re-shipment of grain originally transported to Chicago by barge than

[1] 44 F. Supp. 368, 375.

the same railroad charges for re-shipment of the same grain from Chicago to the same places when the grain is brought to the re-shipping point by rail or by lake?

The record shows, and it was admitted at the bar, that barges can by reason of their inherent advantages carry grain more cheaply than railroads. The Commission found that inbound grain barge rates to Chicago ranged from 2.75 to 4.5 cents per hundred pounds for hauls of distances of 57 to 200 miles as contrasted with rail rates for the same distances ranging from 9.5 to 13 cents. Grain can thus be brought to Chicago far more cheaply by barge than by rail. However, only a small proportion of the grain which is sent to Chicago stays in that city, and the new tariff approved by the Commission and by this Court will charge so much more for the shipment of grain to the east when the grain is brought to Chicago by barge than is charged for shipment of grain brought in by rail that this natural advantage of barge transportation will be destroyed. Hereafter it will cost 8.5 cents more to ship ex-barge than ex-rail grain to the east.[2] Under the existing rates, a farmer can ship his grain from Kansas City to New York by barge to Chicago and rail from Chicago to New York for 4.625 cents less than if he uses rail transport all the way from Kansas City to New York. Under the new schedule approved today, that differential is wiped out, and he will hereafter pay 3.875 more to ship by barge and rail than if he ships rail all the way. This order in substance gives ex-barge traffic a 4-cent disadvantage where it previously had a 4-cent advantage. Similar penalties are imposed upon shippers who use barge lines in Missouri, Iowa, and Illinois. The Commission, as its sole finding on the impact of the rates on the barge lines, found that the new rates would not "prohibit" barge shipments.

---

[2] The figure given is the increase in cost of shipment to the best eastern market. The cost varies, depending on the destination of the grain.

Such a finding is irrelevant. A rate need not be prohibitive to be discriminatory. The new rate is manifestly intended to and will have the effect of transferring most of the barge traffic to the railroads, since shippers will not customarily pay 10% more to ship by barge-rail than by rail alone.[3]

Certain questions may be put to one side without elaborate discussion. The new rates cannot be justified on a theory of distinction between long and short hauls since the distances covered are substantially the same whether barge-rail or all-rail transportation is used. The Court asserts that the existing all-rail rates are lawful under the long and short haul clauses, while the existing barge-rail rates are unlawful. But there is nothing in the long and short haul clause which requires that shippers by rail to Chicago from points in Illinois, Iowa, Kansas, and Missouri must be granted a low rate for shipment beyond Chicago which is denied to those who ship into Chicago by barge. Nor is the fact that the rates directly affected by the new tariff are "proportional" of any significance.[4]

---

[3] The new rates for shipment from Chicago to the east of course do not "prohibit" barge shipments to Chicago since the small amount of grain consumed in that city will not be affected by the outgoing rates, and some grain can still be carried to the east by lake transportation for so much of the year as the lakes are open to traffic.

The Court quotes the finding of the Commission that "the proposed schedules are not prohibitive" and that their principal effect will be to reduce the profits of the Chicago elevator operators. If the schedules operate unfairly, as I think they do, it is immaterial whether the farmers or the elevator operators bear the burden of the unfairness; but the Court in relying on this finding pays little regard to the fact that the court below found as a fact that the saving from barge transportation "accrues to the producer" and "does not accrue to the Chicago elevator operator." Unless the Court is willing, as apparently it is not, to reëxamine the evidence and to conclude that the court below is in error, we must take the facts as they are given to us by the District Court. In any case, I think the District Court was correct.

[4] "A through rate is ordinarily lower than the combination of the local rates. When a through rate is made by combination of rates

A through rate may be invalid because of one factor only of the combination of rates which make it up, "and that factor may be a proportional rate." [5]  The only issue to be decided is whether the barge shipper shipping from a given point to Chicago should be given any different proportional rate than rail shippers shipping from the same point to Chicago for equal service out of Chicago, and, for reasons to be set forth below, I find no justification for such a discrimination.[6]

There is no factual issue here on which we are bound to accept the Commission's judgment as we were in *United States* v. *Chicago Heights Trucking Co.*, 310 U. S. 344. Here we have a rate revision which can serve no conceivable purpose except to force shippers to use railroads instead of barge lines.  Reasonable persons may differ as to the wisdom of such a policy, but not as to the certainty of its result; and, as will be shown, Congress has made the policy judgment and has flatly forbidden the Commission to do what it has done.  The situation is similar to *Mitchell* v. *United States,* 313 U. S. 80, 97, in which the Commission sought to shelter a flatly forbidden discrimination behind the shield of expertise.  There, too, we were cited to the *Chicago Heights* case and our many other

---

for intermediate distances the rate for the later link in the shipment is, when lower than the local, spoken of as a proportional rate." *Atchison, T. & S. F. Ry. Co.* v. *United States,* 279 U. S. 768, 771.

[5] *Ibid.,* 776.

[6] The Commission and the Court refer to the fact that ex-barge rates are now equal to ex-truck rates. This is irrelevant. If there is a discrimination against truck shippers, the remedy is an improvement of their situation, not a destruction of barge shipping.  In the words of Chairman Eastman in his dissenting opinion, "My tentative opinion upon it is that where the movement by truck is from territory from which grain can be moved by rail or by water to Chicago subject to the application of the reshipping rates east-bound, the failure to apply such rates to the grain brought in by truck does result in violation of sections 2 and 3, provided adequate provisions for the identification and policing of such shipments are practicable and enforceable."

decisions upholding the right of administrative agencies to make factual judgments. We replied that "On the facts here presented, there is no room, as the Government properly says, for administrative or expert judgment with respect to practical difficulties. It is enough that the discrimination shown was palpably unjust and forbidden by the Act." Such I think should be our answer here.

This tariff is an unjust discrimination within the meaning of § 2 of the Interstate Commerce Act, 49 U. S. C. § 2, which prohibits a carrier from demanding a charge either higher or lower than is charged by any other person for doing for him "a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions." Many decisions make clear that this section does in fact require a real equality. *Interstate Commerce Commission* v. *Baltimore & Ohio R. Co.*, 225 U. S. 326; *Atchison, T. & S. F. Ry. Co.* v. *United States*, 279 U. S. 768. The Commission counters with a contention that here there is "a dissimilarity of conditions prior to the rendering of the transportation service for which the charge in issue is assessed." True there is a difference, if only one, in the conditions prior to the rendering of the service from Chicago to the east. The difference is *solely* that one class of grain moves in to Chicago by barge and another moves in by other means; and this is a ground not of legitimate distinction, but of unfair discrimination. The discrimination would be no worse if the benefits of the cheap through rates were given only to shippers on a favored railroad coming into Chicago, and not to other shippers by rail. *Atchison, T. & S. F. Ry. Co.* v. *United States, supra,* 773. Here all circumstances and conditions are substantially similar, and the Court ought to require the Commission to obey the law by following its own previously announced rule in Chattanooga Packet Co. *v.* Illinois Central R. Co., 33 I. C. C. 384, 392, 393, in which the Commission said: "If

carriers are permitted to apply higher rates for the same service on traffic routed over connecting water lines than on traffic via their all-rail connections, they will be in a position to destroy all water competition and to deprive shippers of the advantage of their location upon navigable waters. . . . We are of the opinion and find that, by restricting their proportional rates to traffic routed over their southern rail connections, defendants are unjustly discriminating against complainant and against shippers who desire to route their goods over complainant's boat line."

The decision of the Commission also violates § 3 (4) of the Interstate Commerce Act, 49 U. S. C. § 3 (4), which under the 1940 amendment to the Interstate Commerce Act is applicable to the appellees, and which forbids carriers to "discriminate in their rates, fares, and charges between connecting lines." This section became applicable to the appellees in the course of the Commission's disposition of this case, but before its opinion was filed. This circumstance is not, as the Commission seems to have supposed, a reason for ignoring the section. No more obvious "discrimination in their rates, fares, and charges" can be imagined, particularly in the light of the general policy of the Transportation Act of 1940.

I think that approval of this tariff is a defiance of the Transportation Act of 1940. 54 Stat. 899. This Act declared it to be "the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each." Title I, § 1. The Act commands the Interstate Commerce Commission that "all of the provisions of this Act shall be administered and enforced with a view of carrying out the above declaration of policy." Congress, fearful, in the words of several members, that the Commission was "essentially a railroad

minded body," [7] took every precaution to prevent discrimination against water carriers.[8]

[7] 84 Cong. Rec. 5965, 5883, 5880–81. Legislation similar in purpose to the 1940 Act was considered by Congressional committees in the 74th and subsequent Congresses. Opposition to legislation giving the Commission authority over water transportation came from representatives of the water shippers. A typical protest was made by Cleveland A. Newton, General Counsel, Mississippi Valley Association, in the hearings before the Committee on Merchant Marine and Fisheries, House of Representatives, 74th Cong., 2d Sess., on H. R. 5379: "This bill if enacted into law will place water carriers along the coast and upon our inland rivers under the absolute domination and control of the Interstate Commerce Commission. That Commission was created to regulate, conserve, and control railways. It is a railway-regulating agency. It naturally has the railway viewpoint, and past experience convinces us that the Commission, as now constituted, is railway-minded and that it would not be in the public interest to place water services under its domination and control. . . . We have observed the performance of the Commission in the past, under a comprehensive declaration of policy enacted by Congress, and that experience, we regret to say, has not inspired confidence." Hearings, p. 471.

[8] "Mr. Lucas: . . . Under the bill, as I understand it, the Interstate Commerce Commission would have the power, and it would be its duty, to fix rates on the Illinois River with respect to the transportation of that wheat and corn. Would it be possible for the Interstate Commerce Commission to fix the rate the same as the railroad rate from that point to St. Louis?

"Mr. Wheeler: Not if the Commission does its duty, because the bill specifically provides that it must take into consideration the inherent advantages of the water carrier. Everyone agrees that goods can be shipped more cheaply by water than by rail." 84 Cong. Rec. 5879.

The following Senators and Representatives, among others, either required assurance that the Commission would not discriminate against water carriers or expressed the conviction that under the statement of policy, the Commission would be unable to discriminate against water carriers: Senators Austin, Clark of Missouri, Connally, Ellender, Lucas, Miller, McNary, Norris, Pepper, Shipstead, Truman, and Wheeler; Representatives Bland, Bulwinkle, Crosser, Culkin, Halleck, Lea, Pierce of Oregon, Sparkman, and Wadsworth.

Senators, particularly those from the midwestern states where the barge lines involved here were operating, were especially fearful that the Commission would do substantially what it has done in this case. They required repeated assurance by the Chairman of the Interstate Commerce Committee of the Senate that the bill was written in such manner that the Commission could not if it desired permit discrimination against water carriers. At great length the Chairman of that Committee explained to apprehensive Senators that the bill contained provisions in three different places which imposed upon the Commission the imperative duty of standing in constant opposition to discrimination against shippers by water.[9]

House members shared the same fears. The first conference report was defeated in the House because it was believed that the bill did not offer adequate protection for water carriers against hostile Interstate Commerce Commission action.[10] A proponent of the bill told the House that "It is not fair to suggest, in my opinion, that the Commission and the courts will not look to this declaration of policy whenever they are called upon to make such construction of the statute and application of it . . . The specific provisions of the bill carry out the declaration of policy. The courts and commissions will recognize that. . . ."[11] Defending the policy provisions as a complete protection against Commission action antagonistic to barge transportation, another sponsor of the bill, opposing a safeguarding amendment, declared that to consider it necessary "You will have to further assume that the Interstate Commerce Commission will not enforce it. You will

---

[9] 84 Cong. Rec. 6125–6128.

[10] The first conference report was rejected by the House on May 9, 1940, 86 Cong. Rec. 5886. The second report was accepted on Aug. 12, 1940, 86 Cong. Rec. 10193.

[11] 84 Cong. Rec. 9865.

have to assume that if a case goes to the courts, the courts will neither construe nor enforce the provisions of this policy." [12] As I see it, the Commission in this case has declined to enforce Congress' policy and the Court has failed to construe and enforce the Act as Congress clearly intended it should.

This is not all. The first conference report having been defeated, the second conference report brought in changes intended to offer more protection to water carriers. The conferees reported that: "This measure will place upon the Interstate Commerce Commission, not only the power, but the duty, to protect and foster water transportation and preserve its inherent advantages." [13] As a closing, clinching argument intended to persuade the House that the Commission would be fair to water carriers, the statement of Commissioner Eastman (who dissented from the order of the Commission here) was quoted. Eastman assured the Congressmen interested in water transportation that certain provisions of the bill "coupled with the admonition in the declaration of policy in section 1 that the provisions of the act be so administered as to recognize and preserve the inherent advantages of each mode of transportation, will afford adequate protection in this respect. If experience should show that further protection is needed, contrary to our expectation, Congress can amend the act, but such a restriction as is now proposed is, we believe, both unnecessary and undesirable." [14]

---

[12] 84 Cong. Rec. 9863.

[13] 86 Cong. Rec. 10172.

[14] 86 Cong. Rec. 10191. In his dissenting opinion, Chairman Eastman said: "The report states that the 'proposed schedules will not prohibit the movement by barge-rail even to trunk-line territory, their principal commercial effect being to reduce the profit of the Chicago elevator operators.' I do not so understand the evidence. . . . As I understand it, the effect of the proposed schedules, unless the prices paid to the farmers whose grain is barged are reduced, will be to limit the outlet of the ex-barge grain to local consumption in Chicago and to the lake and lake-rail routes to eastern points."

The final statement of the last proponent of the 1940 Act, spoken just before the vote was taken on the second conference report, were these: "There is nothing whatever in the pending measure which could by any fair interpretation be regarded as unjust to water transportation or to any other kind of transportation." The speaker then read the policy provisions of § 1 and asked: "How much plainer could language be than that is? It is crystal clear that there is no basis in the bill for the apprehension expressed by those opposed to the measure." [15]

Although these proceedings were not initiated under the 1940 Act,[16] the Commission should have felt itself bound by that Congressional expression of policy. Yet the legislative history just recited makes it clear that the Commission has flagrantly flouted the express mandate of Congress. It is said, however, that the Commission reserves the right to take further action in a "proper proceeding" in which it *might* prescribe proportional rates [on the ex-barge traffic] or joint barge-rail rates lower than the combinations." At some future day the Commission may correct this discrimination. But the day for Commission action was the day this case was decided, and the day for action by this Court is now. The Commission is not bound by the technical procedures of the common law, and it should not strain to avoid the enforcement of Congressional will because of the formal fashion in which questions are presented to it. In this proceeding it was the Commission's duty "to protect and maintain a transportation

---

[15] 86 Cong. Rec. 10192.

[16] The 1940 Act gave the Commission jurisdiction to regulate water transportation directly. Here the same effect is achieved under the Commission's other powers by a tariff aimed at shippers who have previously used water transportation. For the background and nature of the 1940 Act see Eastman, The Transportation Problem, 30 Amer. Econ. Rev. 124; Stein, Federal Regulation of Water Carriers, 16 Jour. Land and Pub. Util. Econ. 478; Harbeson, The Transportation Act of 1940, 17 *ibid.* 291; Regulation of Water Carriers, 50 Yale L. Jour. 654.

system free from partiality to particular shippers.  The
Commission acted in its capacity as a public agency" and
was obligated to carry out "duties imposed upon it by Con-
gress in the interest of shippers generally, the national
transportation system and the public interest."  *United
States* v. *Chicago Heights Trucking Co., supra,* 354.  The
fact that this was not a formal proceeding to fix propor-
tional rates under § 6 (11) (b) did not detract from the
Commission's powers.  *Chicago, R. I. & P. Ry. Co.* v.
*United States,* 274 U. S. 29, 36; *United States* v. *New York
Central R. Co.,* 272 U. S. 457, 462.  The Commission itself
in cases where the command of Congress was far less em-
phatic than here, has stated that an investigation and
suspension proceeding such as this one "opens for consider-
ation the lawfulness of the suspended rates under all pro-
visions of the act."  Sugar From Gulf Coast Port Groups
To Northern Points, 234 I. C. C. 247, 251.  "The reproach
of dealing with the matter piecemeal" is incurred by the
Commission here as it was in *United States* v. *Chicago,
M., St. P. & P. R. Co.,* 294 U. S. 499, 510.  It cannot, with
due regard to its duty, shift responsibility "from the shoul-
ders of the present to the shoulders of the days to come."
Here as in that case, postponement serves to leave "this
particular carrier helpless in the interval." [17]

Congressman Bland, who opposed the 1940 Act on the
ground that it lacked sufficient safeguards to prevent action
by the Commission hostile to water transportation called

---

[17] The Court interprets the Commission's order as leaving open the
right of the shippers affected to bring actions for reparations for in-
juries suffered under the new rates.  This will bring small practical
comfort to the barge lines since the shippers will be unlikely to ship
by barge when the price of every shipment is dependent on future legal
proceedings.  The barge lines, "helpless in the interval" pending new
legal proceedings, risk serious financial injury, if not bankruptcy.
While the shippers can ship by barge now and sue later, they are
presumably interested in buying transportation, not lawsuits.

attention to the procedural delays in rate cases before that body, delays which he declared would be used to strangle financially weak water carriers, forcing them to "yield or transfer their operation to other streams." He pointed out this "would mean the death of water carriers"; that the railroads knew how to obtain delay and knew the disastrous consequences that would follow to their competitors; that railroads "seek to profit" by procedural delay; and that the diversity of their interests and extent of their revenues was so great that they could survive delays which would be unendurable for competitors.[18] The Congressman was a good observer and a sound prophet.

The judgment of the District Court enjoining enforcement of this order was correct and should be affirmed.

MR. JUSTICE DOUGLAS and MR. JUSTICE MURPHY join in this opinion.