**TENNESSEE VALLEY AUTHORITY et al.**
**v. UNITED STATES et al.**

Civ. A. No. 801.

United States District Court
N. D. Alabama, Northwestern Division.
March 21, 1951.

---

Joseph C. Swidler, Gen. Counsel, and Charles J. McCarthy, Asst. Gen. Counsel, Tennessee Valley Authority, Knoxville, Tenn., for TVA.

James W. Wrape, Memphis, Tenn., for Commercial Barge Lines, Inc.

Egerton, McAfee, Armistead & Davis, Knoxville, Tenn., for J. Allen Smith & Co.

Herbert A. Bergson, Asst. Atty. Gen., James E. Kilday and John F. Baecher, Sp. Assts. to Atty. Gen., Richard E. Guggenheim, Atty., Department of Justice, Washington, D. C., and John D. Hill, U. S. Atty., Birmingham, Ala., for United States.

Daniel W. Knowlton, Chief Counsel, and Allen Crenshaw, Asst. Chief Counsel, Interstate Commerce Commission, Washington, D. C., for ICC.

W. A. Northcutt, Louisville, Ky., for L. & N. R. Co.

Cabaniss & Johnston, Birmingham, Ala., and Charles Clark, A. J. Dixon and James A. Bistline, all of Washington, D. C., for Southern Ry. Co.

Before McCORD, Circuit Judge, and KENNAMER and LYNNE, District Judges.

LYNNE, District Judge.

This action, authorized by the provisions of 28 U.S.C.A. § 1336, was brought by Tennessee Valley Authority, Commercial Barge Lines, Inc., and J. Allen Smith & Company,[1] on July 31, 1950, to enjoin, set aside, annul and suspend an order of the Interstate Commerce Commission entered on May 3, 1949, in a proceeding entitled, "Investigation and Suspension Docket No. 5473—Switching at Knoxville," 274 I.C.C. 195.

The United States was named as the sole defendant by the Commission; Southern Railway Company[2] and Louisville and Nashville Railroad Company[3] have been granted leave to intervene and have filed an answer to the complaint.[4]

The Commission's order, which plaintiffs seek to have annulled and set aside (1) vacated a prior order that suspended the operation of certain tariff schedules of the Southern and L. & N., and (2) discontinued the proceedings before the Commission. Its effect was to authorize Southern and L. & N. to increase the charge for interstate ex-barge switching at the Port of Knoxville, Tennessee, from $12.38 per car to $23.44 per car.[5]

In an effort to make the advantages of water transportation available to the people of the Tennessee Valley, TVA has constructed the projects necessary to provide a nine-foot navigable channel from the mouth of the Tennessee River to Knox-

1. Hereinafter referred to as TVA, Commercial and the Smith Industry, respectively.

2. Hereinafter referred to as Southern.

3. Hereinafter referred to as L. & N.

4. Southern and L. & N. adopted the answer filed in behalf of the Commission.

5. The tariffs of the Railroads which sought to increase the ex-barge switching charges were filed to become effective March 20, 1947. By these tariffs, the carriers sought to increase to $15 the existing charge of $7.92. By the time the hearing was held, the $7.92-charge had become $12.38 and the pro-

posed $15-charge had become $23.44 as a result of general rate increases authorized by the Commission in Ex Parte No. 162, Increased Railway Rates, Fares, and Charges, 1946, 266 I.C.C. 537 (1946), and Ex Parte No. 166, Increased Freight Rates, 1947, 269 I.C.C. 33 (1947). This level, which continued through May 6, 1948, was used by the Commission in its decision and will be used throughout this opinion. Due to general increases authorized in Ex Parte No. 168, Increased Freight Rates, 1948, 276 I.C.C. 9 (1949), which became effective subsequent to May 6, 1948, the $15-charge has now become $25.78 and the $7.92-charge would now be $13.62.

ville, Tennessee, and, to accommodate small industries which are unable to bear the costs of separate facilities, it has also constructed a public-use barge terminal at Knoxville, Tennessee. The Port of Knoxville public terminal was completed in February, 1944. It is located on the north bank of the Tennessee River and is served by the tracks of both Southern and L. & N.

By tariffs published to become effective March 20, 1947, Southern and L. & N. proposed to increase the charge for switching interstate ex-barge traffic from $7.92 to $15.00. The proposed increases were published as applicable to all interstate intraterminal switching, but since there is no other interstate intraterminal switching at Knoxville, they applied, in fact, only to interstate ex-barge switching. Petitions for suspension of the proposed charge were filed with the Commission by TVA, Glazer Steel Corporation, and Security Mills, all of Knoxville, in response to which the Commission, exercising the powers conferred upon it by 49 U.S.C.A. § 15(7), suspended the proposed charge for investigation.

Upon due notice, a hearing was held before Examiner Harold M. Brown at Knoxville, Tennessee, on May 19 and 20, 1948, and at Washington, D. C., on June 29, 1948. The record made at these hearings embraces 345 pages of testimony, together with 33 exhibits, all of which have been carefully read and considered by the court.

As of May 6, 1948, the pertinent switching charges at Knoxville were as follows: Intraterminal industrial switching, $7.92; Interstate ex-rail switching, $9.38; Intrastate ex-barge switching, $7.92; Interstate ex-barge switching, $12.38. The then proposed ex-barge switching charge was $23.44.[6]

On October 25, 1948, the Examiner filed a proposed report in which he recommended that the Commission should find that the proposed charge of $23.44 per car was unjust and unreasonable; that the evidence supported a conclusion that a charge of $19.00 per car would be just and reasonable, and that an order should be entered requiring the cancellation of the proposed schedules without prejudice to the filing of new schedules in conformity

6. In order to correlate and evaluate the evidence before the Commission, the following definitions of terms are indicated:

Knoxville Switching District is the area within which the switching charges apply. The limits of this district are shown in Exhibit #1, with the L. & N. overlaid in red and the Southern in green for the convenience of the court. Movements between the Knoxville Switching District and points outside thereof are referred to as line-haul movements.

Switching is any movement entirely within a switching district. Depending upon the purpose of the classification, switching may be classified as: (1) interstate or intrastate; (2) intraterminal, interterminal, or connection-terminal; or (3) industrial, ex-barge, or ex-rail.

Interstate switching is any switching which forms a part of an interstate movement. All other switching is intrastate.

Intraterminal switching is a switching movement between two points on the switching railroad's lines.

Interterminal switching is a switching movement from an origin on the line of one railroad to a destination on the line of another.

Connection-terminal switching is a switching movement between a point on the switching railroad's line and a point of interconnection with another railroad.

Industrial switching is a switching between two industries and may be either intraterminal or interterminal. At Knoxville it is intrastate because the limits of the switching district are entirely within the State.

Ex-barge switching is a switching movement between a barge terminal and an industry. It may be either intraterminal or interterminal. It may also be interstate or intrastate but, as related to the purposes of this opinion, the term refers to interstate intraterminal ex-barge switching.

Ex-rail switching is a switching movement between an industry and a point of connection with another railroad. It is synonymous with connection-terminal switching. It may be either interstate or intrastate, depending upon the destination or origin and the route of movement of the through movement of which it is the beginning or end.

with his proposed findings.[7] Exceptions to the proposed report were filed by the railroads, TVA, Glazer Steel Corporation, the Smith Industry, and the American Barge Line, Inc., and each replied to the exceptions of the other. The parties were heard in oral argument before Division 3 of the Commission on February 9, 1949.

On May 3, 1949, Division 3 issued a report and order finding that the proposed charge was just and reasonable, vacating the prior order of suspension, and discontinuing the Commission proceeding.[8]

On August 1, 1949, TVA, Glazer Steel Corporation, and the Smith Industry filed a petition with the Commission for reargument before and reconsideration by the entire Commission. The railroads replied to this petition, which was denied by an order entered at a General Session of the Commission on November 14, 1949.

After laborious, if inexpert, consideration of the evidence introduced before the Commission, this court offers no criticism of the Commission's report because of lack of form in which the facts are found. To recite the facts deemed relevant and to discuss them at length satisfies the responsibility of the Commission in this regard. To support their contention that the proposed charges were reasonable on the one hand and non-discriminatory on the other, the railroads adduced evidence which the Commission properly considered under three broad categories, viz: (1) comparisons between the proposed charges and charges in effect elsewhere for similar types of switching; (2) evidence as to the difference in services required on ex-rail and ex-barge switching; and, (3) two cost studies, one prepared by L. & N. and the other by Southern.

We agree with the Commission in dismissing the testimony as to comparative rates for ex-barge switching at other points with the statement "There is no recognized standard; services rendered in each instance are necessary considerations." Hence, a discussion of such evidence is unnecessary.

Before proceeding to a consideration of the evidence which falls within the remaining two categories, it may be observed that the Commission noticed that the movement of freight on the Tennessee River in 1946 amounted to 2,399,250 tons and slightly more in 1947. Since its construction in 1944, movements of freight through the TVA terminal at Knoxville have consisted entirely in grain to the Smith Industry and Security Mills, steel to Glazer Steel Company, and tarpaulins to the Camel Manufacturing Company. In the three and one-half year period prior to June 30, 1947, this traffic amounted approximately to 22,000 tons. Admittedly, the failure of the river traffic to develop more extensively has been due largely to the absence of regularly scheduled common carrier barge service thereon.

With respect to the evidence pertaining to a comparison of services required on ex-barge and ex-rail cars, the Commission, after reciting the testimony in this respect, discussed it at length, as appears from its report.

One of the principal differences between ex-barge and ex-rail switching, developed by the testimony and accepted by the Commission, involved car rental, both an additional service and an additional cost. In ex-barge switching, it is necessary for the railroad to supply an empty car to the Port of Knoxville terminal and return subsequently to take the loaded car to the consignee; whereas, on ex-rail switching, it is necessary only to switch the loaded car from the point of interchange with the connecting railroad to the consignee.

Because the principal commodity involved under the increased charge is wheat, which moves to Knoxville by barge from interstate origins and is switched by Southern to the Smith Industry, the facts

---

7. This court considers highly revealing the following conclusion excerpted from the penultimate paragraph of the proposed report of Examiner Brown in commenting upon his recommendation that a just and reasonable charge would

be $19.00 per car: "The charges suggested are in the final analysis based to a certain extent on judgment and are necessarily more or less arbitrary."

8. Switching at Knoxville, 274 I.C.C. 195.

discussed by the Commission relate largely to a typical switching movement of wheat.

When a barge movement is expected, TVA or the consignee telephones the Southern yardmaster for class "A" box-cars. The yardmaster gives a written order to the switching crew to place the desired cars on the TVA siding. Upon arrival at city yard, the empties are examined by car inspectors and those found suitable are turned over to the engine crew which classifies them on individual tracks assigned to the several industrial zones on the terminal. Those for TVA and other industries in that zone are then moved to the riverfront extension tracks, where they are reswitched in industry order and then delivered to the industry concerned. On its return trip, the engine picks up loaded cars at TVA and industries in its territory and delivers them to the west end of city yard, where another crew classifies them for further handling. After the car of wheat is delivered to the Smith Industry and unloaded, the car, either empty or reloaded, is picked up by the engine crew working that zone and is returned to city yard.

Since no barge line operating regularly to and from Knoxville has any kind of agreement or arrangement with the railroads to make delivery of barge traffic and do not assume any part of the cost of delivery switching, including car rental normally assumed by line-haul carriage, the switching movement of ex-barge wheat may be assimilated to a conventional line-haul operation.

Thus, on the ex-barge car, the Southern has executed a bill of lading and switching expense bill, and has collected the tariff charges. Therefore, additional paper work is required in connection with ex-barge switching, entailing, of course, some additional expense.

On the other hand, ex-rail cars received by the Southern from the L. & N., for example, are moved from the interchange track to city yard. After arrival at city yard there is no difference in the physical service given loaded ex-rail and ex-barge

cars. All-rail cars in transfer service between the city yard and the interchange with L. & N. average, roughly, 150 per day. The time required to perform this service is approximately one engine-minute per car. Ex-barge cars between TVA terminal and city yard require about twenty-five engine-minutes per car, including the movement of empties from city yard to the TVA terminal. The ex-rail car is covered by an interchange report with each railroad bearing half the expense. Hence, Southern and L. & N. at Knoxville are connecting carriers with a definite arrangement for reciprocal switching in receipt and delivery of freight, including payment of the $1.50 per day in rental by the line-haul carrier, which largely compensates for the cost of such switching.

The third category of evidence considered by the Commission related to two cost studies, one by L. & N., the other by Southern. Turning to the latter, which was first discussed by the Commission, it is to be observed that during the period December, 1944, through November, 1947, Southern switched 220 loaded cars of ex-barge traffic, whereas its cost study covered the movement of only 42 cars of wheat which moved from the TVA terminal to the Smith Industry during the period October 5 to 18, 1947. This study purported to show an average cost per car of $25.70, made up of variable and fixed costs plus car rental.

Having handled no traffic from the TVA terminal, the L. & N. computed a theoretical average cost for ex-barge switching of $23.05 per car, derived from a study of the ex-rail and industrial switching from an industry located adjacent to the TVA terminal which took place during the test period. It established a difference in cost between ex-rail and ex-barge switching, including the cost of car rental in each case, of $7.95 per car as against the differential of $14.06 per car inherent in the rate allowed by the Commission.

In its report the Commission points out a number of errors in the Southern cost study, some of which overstate and some of which understate the costs. The L. & N.

study was dismissed with the statement that it understated the cost. No effort was made by the Commission to reconcile the effect on the ultimate cost by analysis of the evidence before the Commission. Indeed, such evidence does not contain sufficient data to appraise substantial overstatements and understatements of costs. The conclusion of the Commission, which we accept as a finding, is set out in the footnote.[9]

Disclaiming any intention to oversimplify the matter, we nevertheless claim to discern a simple basic issue emerging from the complexities of the Commission's report and the record on which it was made. Has the Commission made a finding which will support its order permitting the railroads to charge higher rates for services performed by them in switching freight brought to Knoxville by water carriers than for those they perform in switching freight arriving by rail?

Moving within the narrow range of the issues open to judicial review of the Commission's order,[10] we do not pretend to oppose our bewilderment to its expertise in the adventure of establishing just and reasonable rates. Nor do we exact of it a legalistic formalism in its fact findings. We recognize that they may be "interwoven" with its discussion of the evidence, relating it to the contentions of the parties, and its ultimate conclusions.[11]

But neither this court nor the Commission can afford to ignore the impact of the Transportation Act of 1940 [12] on the statutory authority of the Commission. To review its legislative history for an understanding of the Congressional intent would be a work of supererogation after the opinion of the court in Interstate Commerce Commission v. Mechling, 330 U.S. 567, 67 S.Ct. 894, 91 L.Ed. 1102, and the dissenting opinion of Mr. Justice Black in Interstate Commerce Commission v. Inland Waterways Corporation, 319 U.S. 671, 697–701, 63 S.Ct. 1296, 87 L.Ed. 1655.

In accord as we are with the many authorities [13] cited in briefs of the intervenors, to the effect that courts should adopt a tolerant attitude in reviewing orders of the Commission when it has acted within the ambit of its statutory sanction in passing upon the issues of reasonableness and discrimination with respect to rates and services, we perceive the need for vigilance when the contention is raised that the Commission has apparently ignored its responsibility of seeing that rates are coordinated in accordance with the national transportation policy as declared by the 1940 legislation.[14]

9. "With allowances made for deficiencies including the understatements as well as overstatements in costs, there is sufficient justification for a conclusion that the proposed charge of $23.44 is not excessive. The finding is also justified that the proposed charge is reasonable in relation to the charge of $9.38 on ex-rail traffic considering the respective services rendered and the fact that the car rental on ex-rail traffic is borne by the line-haul carriers. The proposed charge therefore would not be a discrimination against the American. It could be reduced substantially if American would bear the car rental.

"We find that the proposed charge is just and reasonable. The suspension order will be vacated and the proceeding discontinued." (274 I.C.C. 206–207.)

10. Rochester Telephone Corp. v. United States, 307 U.S. 125, 139, 59 S.Ct. 754, 83 L.Ed. 1147.

11. Meeker v. Lehigh Valley R. R., 236 U. S. 412, 428, 35 S.Ct. 328, 59 L.Ed. 644; United States v. Baltimore & O. R. Co., 293 U.S. 454, 465, 55 S.Ct. 268, 79 L.Ed. 587.

12. 54 Stat. 899, 49 U.S.C.A. § 1 et seq.

13. Interstate Commerce Commission v. Union Pacific R. R., 222 U.S. 541, 32 S. Ct. 108, 56 L.Ed. 308; New York v. United States, 331 U.S. 284, 67 S.Ct. 1207, 91 L.Ed. 1492; United States v. Wabash R. Co., 321 U.S. 403, 64 S.Ct. 752, 88 L.Ed. 827; United States v. Chicago Heights Trucking Co., 310 U. S. 344, 60 S.Ct. 931, 84 L.Ed. 1243; Board of Trade of Kansas City v. United States, 314 U.S. 534, 62 S.Ct. 366, 86 L.Ed. 432; Northern Pacific Ry. Co. v. United States, 316 U.S. 346, 62 S.Ct. 1166, 86 L.Ed. 1521.

14. Eastern-Central Motor Carriers Ass'n v. United States, 321 U.S. 194, 206, 64 S.Ct. 499, 88 L.Ed. 668.

■ It is settled that its provisions "flatly forbid the Commission to approve barge rates or barge-rail rates which do not preserve intact the inherent advantages of cheaper water transportation, but discriminate against water carriers and the goods they transport." Moreover, "Congress left the Commission no discretionary power to approve any type of rates which would reduce the 'inherent advantage' of barge transportation in whole or in part." [15]

Irrespective of whether this case may be distinguished from the Mechling case by contrasting the factual context of each, we believe that pertinent principles established by the court are dispositive of this review. We are constrained to the opinion that the Commission, in discussing the rule of the Mechling case, whether or not it conceded its applicability, misapprehended its requirements as to the basic findings essential to support a rate differential immediately affecting carriers both by rail and by water.

Recognizing that there may be both qualitative and quantitative differences in services performed by railroads in handling ex-barge and ex-rail freight, the court was nevertheless explicit in holding that "To justify increasing the reshipping rates of ex-barge grain the Commission would have to make findings supported by evidence to show how much greater is the cost to the eastern roads of reshipping ex-barge grain than of [reshipping] ex-lake or ex-rail grain moving from the same localities and requiring the same service as does the ex-barge grain." [16]

■ Switching ex-barge freight entails more service and consequently involves more costs than are involved in switching ex-rail freight, the Commission found. We agree that there is substantial evidence in the record to support, even to demand such a conclusion. "But the extra service must fit the extra charge and cannot justify lump sum rate increases which cut into the inherent advantages of cheaper barge transportation which Congress intended to guarantee to shippers." [17]

Relying upon cost studies, which it criticizes freely for deficiencies involving both "understatements" and "overstatements," the Commission strikes an average between the two and arrives at a finding that "there is sufficient justification for a conclusion that the proposed charge of $23.44 is not excessive." [18] No effort was made to sift the understatements and overstatements and to translate them, clearly and unambiguously, into terms of actual difference in cost involved in switching ex-barge and ex-rail freight.

■ Of the charge of $23.44, approved by the Commission, it may be said, as Examiner Brown forthrightly observed of the charges of $19.00 recommended by him after considering the same record, "The charges suggested are in the final analysis based to a certain extent on judgment and are necessarily more or less arbitrary." [19]

We hold that the Commission has misapplied the law by failing to make the basic findings [20] required to support its order and conclude that such order must be set aside.

KENNAMER, District Judge (dissenting).

Rate making in matters of this nature is the function of the Interstate Commerce Commission; and transportation rate making and economics is a complex and

15. 330 U.S. at page 577, 67 S.Ct. at page 899, 91 L.Ed. 1102.

16. 330 U.S. at page 583, 67 S.Ct. at page 902, 91 L.Ed. 1102.

17. 330 U.S. at page 581, 67 S.Ct. at page 901, 91 L.Ed. 1102.

18. For the context of this quotation see Fn. 9, supra.

19. See Fn. 7, supra.

20. The fundamental error of the Commission was its apparent failure to appreciate that "the basic findings essential to the validity of a given order will vary with the statutory authority invoked and the context of the situation presented." Alabama Great Southern R. Co. v. United States, 340 U.S. 216, 228, 71 S. Ct. 264, 272.

difficult problem, requiring the attention of experts, and the results cannot be attained by a mathematical formula applicable to all situations. Nor should this court exact of it a legalistic formalism in its fact findings.

The petitioners allege in their bill of complaint that the defendant Commission's decision is arbitrary, capricious, without rational basis, and constitutes an abuse of discretion; that the increased charges discriminate against water carriers and deprive shippers of the inherent advantages of barge transportation, in that the differential between ex-barge and ex-rail charges is not justified by any evidence in the record.

The evidence before this court is to the contrary. The Commission conducted full and fair hearings on the petition for suspension of the proposed increased charge. Voluminous evidence was taken, including the testimony of experts and transportation cost analysts, submitted by protesting petitioners, respondent carriers, and other interested parties. Witnesses, pro and con, were examined and cross examined. Exhibits were introduced by all parties who desired to do so, and briefs were submitted and considered. The record made at these hearings embraces 345 pages of testimony, together with 33 exhibits.

By the Transportation Act of 1940, it is as much the duty of the Interstate Commerce Commission to recognize and preserve the inherent advantages of rail as well as barge transportation. Here there was a conflict between the two, and the Commission, acting within the ambit of its statutory sanction, had to reconcile the conflict so as to establish and maintain reasonable charges for rail transportation services, without unjust discrimination, preferences or advantages.

There was competent and ample evidence before the Commission to sustain its order. Under these circumstances, the judgment of the Commission should not be disturbed by this court.

The relief prayed for in the bill of complaint should be denied.