**ARROW TRANSPORTATION CO. et al.,**
**Plaintiffs**

**v.**

**UNITED STATES of America, Defendant**
**and Interstate Commerce Commission**
**et al., Intervening Defendants.**

No. 961.

United States District Court
N. D. Alabama,
N.W. D.

July 20, 1959.

Donald Macleay, Washington, D. C.; MacDonald Gallion, Atty. Gen., State of Alabama, Thomas M. Stowers, Alabama Public Service Commission, Montgomery, Ala., George F. McCanless, Atty. Gen., Harold Seligman, Tennessee Public Service Commission, Nashville, Tenn., Joe Starnes, Guntersville, Ala., F. G. Asquith, Knoxville, Tenn., John A. Caddell, Decatur, Ala., John C. Lovett, Benton, Ky., Fenner Heathcock, Union City, Tenn., Charles J. McCarthy, General Counsel, Tennessee Valley Authority, Knoxville, Tenn., for the plaintiffs.

W. L. Longshore, U. S. Atty., and Malcolm L. Tanner, Asst. U. S. Atty., Birmingham, Ala., Earl E. Pollock, U. S. Department of Justice, Washington, D. C.; Robert W. Ginnane, General Counsel, Interstate Commerce Commission, Washington, D. C., and I. K. Hay, Associate General Counsel, Interstate Commerce Commission, Washington, D. C., for the defendants.

A. J. Dixon, Washington, D. C.; E. J. Zoll, Chicago, Ill., R. W. Henriott, Louisville, Ky., James A. Simpson, Birmingham, Ala., Russell B. James, Don C. McDevitt, J. M. Souby, Jr., Chicago, Ill., Robert H. Stahlheber, St. Louis, Mo., M. L. Cassell, Chicago, Ill., Byron M. Gray, Topeka, Kan., J. S. Chartrand, Chicago, Ill., and Freeman Bradford, Indianapolis, Ind., for the intervenors.

Before RIVES, Circuit Judge, and LYNNE and GROOMS, District Judges.

LYNNE, District Judge.

This action, authorized by the provisions of 28 U.S.C. § 1336 (1952), was brought by the Arrow Transportation Company [1] and sixteen other plaintiffs [2]

1. Hereinafter referred to as "Arrow."

2. State of Alabama, Alabama Public Service Commission, State of Tennessee, Tennessee Public Service Commission, Alabama Farm Bureau Federation, City of Guntersville, Alabama, Guntersville Chamber of Commerce, Chattanooga Area Milk Producers Association, Chattanooga Chamber of Commerce, Knox-

to enjoin, set aside, annul, and suspend orders of the Interstate Commerce Commission in a proceeding entitled American Barge Line Co. v. Alabama G. S. R. R., 296 I.C.C. 247 (1955), affd 303 I.C. C. 463 (1958), modified March 24, 1959, insofar as they relate to rates on ex-barge grain [3] from the Tennessee River ports of Sheffield, Decatur, Guntersville, Chattanooga, and Knoxville. Impleaded as a statutory defendant, the United States has filed an answer in which it confesses error and joins the plaintiffs in their prayer for relief. The Interstate Commerce Commission, the Kansas State Corporation Commission, certain Kansas and Missouri milling interests, the Boards of Trade of Kansas City, Chicago, and Indianapolis, and the major southern and midwestern railroads have been granted leave to intervene and have filed answers to the complaint in support of the Commission.

This controversy has had a long history. In its natural state the Tennessee River was a series of rapids and shoals and was unsuited for modern navigation. But with the construction of a series of dams by the Tennessee Valley Authority, it has now become a highly navigable waterway which provides a direct route for the movement of grain from the surplus producing areas of the Midwest to the deficit areas of the Southeast where the grain is needed to serve expanding livestock and poultry industries, as well as for human consumption. With the development of the Tennessee River came the need for ex-barge rates which would permit the grain to move over the Tennessee River and by rail beyond the river ports.

Under the existing rate structure the railroads charge their full local rates for the transshipment by rail of ex-barge grain from the Tennessee River ports while affording more favorable treatment to ex-rail grain transshipped from those ports, and also to ex-barge grain transshipped from the competing port of Memphis. This rate structure inhibits the movement of barge grain beyond the ports and the plaintiffs contend, and we think correctly, that this rate structure does not recognize and preserve the inherent advantages of barge transportation as required by the National Transportation Policy and is contrary to the requirements of various sections of the Interstate Commerce Act.

---

ville Chamber of Commerce, City of Decatur, Alabama, Decatur Chamber of Commerce, Farmers Union Grain Terminal Association, Indiana Farm Bureau Cooperative Association, Inc., Tennessee Farm Bureau Federation, and Tennessee Valley Authority.

3. The following definitions of terms will be helpful to an understanding of the grain rate structure with which this case is concerned:

*Ex-barge grain*—Grain transported outbound from a port by rail which has had a prior movement into that port by barge.

*Ex-rail grain*—Grain transported outbound from a port by rail which has had a prior movement into that port by rail.

*Local rate*—A rate which applies to the entire transportation of grain and grain products between two local points.

*Proportional rate*—A rate less than the local rate which is applicable only when there has been a prior movement by rail or barge. To be entitled to the proportional rate, the shipper need not establish that he is reshipping the identical grain or grain product that moved inbound. He need only surrender bills of lading showing an inbound movement of equivalent tonnage.

*Ex-barge proportional rates*—Proportional rates applicable to ex-barge traffic.

*Ex-rail proportional rates*—Proportional rates applicable to ex-rail traffic.

*Joint through rate*—The total rate from the origin to the final destination published as a single rate covering the entire movement.

*Transit*—The privilege of stopping grain or grain products at any point for storing or processing and subsequently shipping an equivalent tonnage outbound.

*Transit point*—Any place at which a commodity may be transited.

*Transit balance*—The difference between the rate from origin to the transit point and the rate from origin to the final destination.

*Division*—The share of a through rate received by any of the participating carriers.

On January 4, 1951, a complaint was filed with the Commission asking that it prescribe ex-barge rates on grain from the Tennessee River ports. After extensive hearings, briefs, and argument, the Commission dismissed the complaint on July 18, 1955. A petition for reconsideration was denied and the plaintiffs then commenced this action on March 6, 1956. Before filing an answer the Commission, by order dated May 4, 1956, reopened the ICC proceeding on its own motion for reconsideration in the light of the Supreme Court's decision in Dixie Carriers v. United States, 1956, 351 U.S. 56, 76 S.Ct. 578, 100 L.Ed. 934. With the consent of all parties, this court entered a stay of this action. After further argument and briefs the Commission kept the case under advisement until March 19, 1958, when it entered an order affirming its previous decision. Plaintiffs then filed an amended and supplemental complaint on May 29, 1958, asking this court to enjoin and set aside the Commission's order of March 19, 1958.

The complaint in the ICC proceeding was filed jointly by Arrow and two other barge lines, American Barge Line Company and Federal Barge Lines, Inc. The complaint also involved ex-barge rates from ports on other rivers as well as the Tennessee, but Arrow was interested only in the rates from the ports on the Tennessee River. On July 9, 1958, American and Federal filed a petition with the Commission seeking reconsideration of that part of the Commission's order of March 19, 1958, which related to ports on rivers other than the Tennessee. No party requested reconsideration of the Tennessee River phase of the ICC proceeding. By order dated August 27, 1958, the Commission granted American and Federal's petition and, on its own motion, reopened the proceeding for reconsideration and further oral hearing on all issues, including those before this court. On September 12, 1958, this court set down this case for hearing on October 27. On Septem-

ber 17 the Commission entered yet another order, vacating its order of March 19, 1958, and setting the case for further hearing before an Examiner on October 20.

A second supplemental complaint was filed herein on October 6, 1958, asking this court to set aside the Commission's orders of August 27 and September 17, 1958, and, in the alternative, for an order under section 10(e) of the Administrative Procedure Act [4] compelling the Commission to take action "unlawfully withheld or unreasonably delayed." On October 14, 1958, this court granted a temporary restraining order enjoining the Commission from holding any further hearing in the ICC proceeding on the issues involved in this case pending a hearing and determination by this court.

A hearing before this court was held on October 27, 1958. In order to avoid the appearance of unseemly conflict between court and Commission, we dissolved the temporary restraining order on November 3, and ordered that the filing of an opinion and the entry of final judgment in this case would be withheld until March 2, 1959,

"* * * without prejudice to exercise by the Interstate Commerce Commission of its concurrent jurisdiction and to the entry by the Commission of a final, definitive order relating to the issues involved herein on or before such date * * *."

In response to a request from the Commission dated February 19, 1959, we agreed to withhold judgment for an additional thirty days and on March 24 the Commission issued an order and accompanying report containing its findings on reconsideration. In its latest decision the Commission has prescribed rates which, when put in effect, will cure the section 3(1) violation of which the plaintiffs complain, but it has failed to give Arrow relief as a connecting carrier. The report and order of March 24 denied relief under sections 1, 2 and 3(4) of the Interstate Commerce Act by reaf-

4. 60 Stat. 243–244 (1946), 5 U.S.C.A. § 1009(e).

firming and incorporating by reference the Commission's prior findings on these issues. It cited no new evidence and made no new findings on these issues. On April 20 we set this case down for argument on the status of the section 3(4) issue in this action under the Commission's report and order of March 24, 1959. The Commission then on May 25 entered an order postponing the effective date for compliance with its order of March 24, 1959, "in view of the pendency of the action before the court." Argument was heard on June 17 and the plaintiffs filed a third supplemental complaint to bring before the court so much of the latest decision of the Commission as reaffirmed its previous findings on the sections 1, 2 and 3(4) issues at the Tennessee River ports. The case is now ripe for final disposition by this court.

■ Two threshold contentions relating to the jurisdiction of the court must be resolved. The Commission denies the standing to sue of certain of the plaintiffs but does not question the standing of several of the plaintiffs, including Arrow. In view of the admitted right of these plaintiffs to maintain this action and the liberal statutory provisions for intervention,[5] it is immaterial whether the challenged plaintiffs have standing to sue. Interstate Common Carrier Council of Md. v. United States, D.C.D. Md., 84 F.Supp. 414, affirmed 1949, 338 U.S. 843, 70 S.Ct. 91, 94 L.Ed. 516.

■ The intervening defendants also contend that the effect of the Commission's orders of August 27 and September 17, 1958, was to oust this court of its jurisdiction to decide the case on the merits. All parties concede that at the time both the original and the first supplemental complaints were filed in this court, all the statutory requirements for judicial review had been fully satisfied and plaintiffs had completely exhausted their administrative remedy.[6] It is settled law that the jurisdiction of this court depends upon the facts existing at the time the complaint is filed. Once jurisdiction has vested, it cannot be ousted by subsequent event.[7] In any event, any possible question as to jurisdiction has been eliminated by the filing of the third supplemental complaint, bringing before this court for review so much of the Commission's report and order of March 24, 1959, as reaffirmed its prior findings in issue before this court.

Turning to the merits, it is at once apparent that this case presents another

5. "The Interstate Commerce Commission and any party or parties in interest to the proceeding before the Commission, in which an order or requirement is made, may appear as parties of their own motion and as of right, and be represented by their counsel, in any action involving the validity of such order or requirement or any part thereof, and the interest of such party.
   "Communities, associations, corporations, firms, and individuals interested in the controversy or question before the Commission, or in any action commenced under the aforesaid sections may intervene in said action at any time after commencement thereof" (62 Stat. 970 (1948), 28 U.S.C. § 2323 (1952)).

6. "When an application for rehearing, reargument, or reconsideration of any decision, order, or requirement of a division, an individual Commissioner, or a board with respect to any matter assigned or referred to him or it shall have been made and shall have been denied, or after rehearing, reargument, or reconsidera-

tion otherwise disposed of, by the Commission or an appellate division, a suit to enforce, enjoin, suspend, or set aside such decision, order, or requirement, in whole or in part, may be brought in a court of the United States under those provisions of law applicable in the case of suits to enforce, enjoin, suspend, or set aside orders of the Commission, but not otherwise" (54 Stat. 916 (1940), 49 U.S.C.A. § 17(9) (1952)).

7. Mullen v. Torrance, 1824, 9 Wheat. 537, 22 U.S. 537, 6 L.Ed. 154; St. Paul Mercury Indemnity Co. v. Red Cab Co., 1938, 303 U.S. 283, 58 S.Ct. 586, 82 L.Ed. 845; Minneapolis & St. L. R. Co. v. Peoria & P. U. Ry. Co., 1926, 270 U.S. 580, 46 S.Ct. 402, 70 L.Ed. 743; Gulf, M. & N. R. Co. v. Merchants' Speciality Co., 5 Cir., 1931, 50 F.2d 21; Corray v. Baltimore & O. R. Co., D.C.E.D.Ill.1933, 2 F.Supp. 829; Pacific Inland Tariff Bureau v. United States, D.C., 129 F.Supp. 472, affirmed on rehearing, D.C.D.Or.1955, 134 F.Supp. 210.

chapter in the conflict between the requirement of the National Transportation Policy that the provisions of the Interstate Commerce Act be administered in such a way as to preserve the inherent advantages of water transportation and the desire of the railroads to offset those advantages by refusing to accord to traffic received from a connecting barge line the same treatment accorded to traffic received from connecting railroads.

Reversing the usual procedure, we turn first to the controlling legal principles before discussing the facts to which these principles must be applied.

The Transportation Act of 1940 declares that it is the National Transportation Policy

"* * * to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each * * *" [54 Stat. 899 (1940), 49 U.S.C.A. note preceding § 1].

■ The legislative history of this statutory provision is set out in the dissenting opinion of Mr. Justice Black in Interstate Commerce Commission v. Inland Waterways Corp., 1943, 319 U.S. 671, 697–701, 63 S.Ct. 1296, 87 L.Ed. 1655, and in the subsequent opinions of the court in Interstate Commerce Commission v. Mechling, 1947, 330 U.S. 567, 67 S.Ct. 894, 91 L.Ed. 1102, and Dixie Carriers v. United States, supra. That history shows that many members of Congress were apprehensive that the Commission would so exercise the regulatory powers conferred by the Transportation Act of 1940 as to prevent water carriers from competing effectively with the railroads. The act was passed only after repeated assurances that these fears were groundless because the Commission would be bound by the provisions of the National Transportation Policy.

There was extensive debate as to whether the National Transportation Policy prescribed standards to which the courts would require the Commission to adhere. To eliminate any question on this score, Congress adopted the Whittington amendment, which provides that:

"All of the provisions of this [the Interstate Commerce] Act shall be administered and enforced with a view to carrying out the above declaration of policy" [54 Stat. 899 (1940), 49 U.S.C.A. note preceding § 1].

Congress thus made clear that it was imposing on the Commission a positive and active duty to administer each provision of the act in such a way as to preserve the inherent advantages of each mode of transportation.

That the standards prescribed by the National Transportation Policy are binding upon the Commission has been frequently affirmed by the United States Supreme Court.[8] The most recent pronouncement is in Schaffer Transp. Co. v. United States, 1957, 355 U.S. 83, 78 S.Ct. 173, 2 L.Ed.2d 117, where the court said:

"The National Transportation Policy, formulated by Congress, specifies in its terms that it is to govern the Commission in the administration and enforcement of all provisions of the Act, and this Court has made it clear that this policy is the yardstick by which the correctness of the Commission's actions will be measured." 355 U.S. at pages 87–88, 78 S.Ct. at page 176.

The precise issue of whether the Commission can penalize ex-barge traffic by permitting the railroads to charge higher rates on such traffic has been before the United States Supreme Court on

8. McLean Trucking Co. v. United States, 1944, 321 U.S. 67, 80–83, 64 S.Ct. 370, 88 L.Ed. 544; Eastern-Central Motor Carriers Ass'n v. United States, 1944, 321 U.S. 194, 206, 64 S.Ct. 499, 88 L.Ed. 668; Interstate Commerce Commission v. Mechling, 1947, 330 U.S. 567, 67 S.Ct. 894, 91 L.Ed. 1102; Dixie Carriers v. United States, 1956, 351 U.S. 56, 76 S.Ct. 578, 100 L.Ed. 934; Schaffer Transp. Co. v. United States, 1957, 355 U.S. 83, 78 S. Ct. 173, 2 L.Ed.2d 117.

three occasions. In Interstate Commerce Commission v. Mechling, supra, the Supreme Court held that the Commission could not lawfully permit the railroads to charge higher rates on ex-barge grain than they charged on ex-rail grain. In Dixie Carriers v. United States, supra, the court held that the Commission could not permit the railroads to apply local rates to the handling of ex-barge sulphur where ex-rail sulphur was handled on a division of a joint rate. In both of these decisions the Supreme Court made clear that the Commission has no discretion to approve any rate structure which deprives shippers of the inherent advantages of water transportation. In James McWilliams Blue Line v. United States, D.C.S.D.N.Y.1951, 100 F.Supp. 66, affirmed I. C. C. v. James McWilliams Blue Line Inc., 342 U.S. 951, 72 S.Ct. 626, 96 L.Ed. 707, the Supreme Court affirmed on motion, on the authority of Mechling, a holding of the lower court that the Commission could not approve a rate structure which permitted higher rail rates on inbound coal traffic if there was a subsequent movement by barge.

Another phase of the same problem was before this court in Tennessee Valley Authority v. United States, D.C.N.D.Ala. 1951, 96 F.Supp. 409. In that case the court held unlawful an attempt by the railroads to charge higher rates for ex-barge switching than for ex-rail switching where the difference in rates was not justified by differences in cost.

These cases stand for a broad principle of general application. As stated by the United States Supreme Court in Mechling:

"The foregoing provisions flatly forbid the Commission to approve barge rates or barge-rail rates which do not preserve intact the inherent advantages of cheaper water transportation, but discriminate against water carriers and the goods they transport.

\* \* \* \* \* \*

" \* \* \* Congress has decided this question of equitable rates as between railroads and barges. It has declared in unmistakable terms that the 'inherent advantage' of the lower cost of barge carriage as compared with that of railroads must be passed on to those who ship by barge. It is therefore not within the province of the Commission to adjust rates, either to equalize the transportation cost of barge shippers with that of shippers who do not have access to barge service or to protect the traffic of railroads from barge competition. For Congress left the Commission no discretionary power to approve any type of rates which would reduce the 'inherent advantage' of barge transportation in whole or in part." Cf. Mitchell v. United States, 313 U.S. 80, 97, 61 S.Ct. 873, 879, 85 L.Ed. 1201." 330 U.S. at pages 577–579, 67 S.Ct. at pages 899–900, 91 L.Ed. 1102.

The principle established by these cases is dispositive of the present proceeding. The Commission has approved ex-barge rates from the Tennessee River ports which deprive shippers of part of the savings which they can accomplish by moving grain inbound to those ports by barge. This it is forbidden to do by the explicit mandate of the Congress.

The plaintiffs complain basically of two types of discrimination—discrimination in favor of the inbound railroads prohibited by section 3(4) of the Interstate Commerce Act, and discrimination in favor of a barge-rail movement through the competing port of Memphis, which is prohibited by section 3(1). In view of the Commission's decision of March 24, 1959, prescribing rates that, when made effective, will eliminate the preference and prejudice in violation of section 3(1), the basic issue remaining for decision by this court is whether there is also a discrimination prohibited by section 3(4).

The situation as to this discrimination can be illustrated by taking the example of a Chattanooga dealer who wishes to ship grain from Kansas City to Chattanooga and subsequently reship it to

Orangeburg, South Carolina. He can purchase grain in Kansas City and arrange for shipment to Chattanooga by barge for delivery by Arrow or by rail for delivery by the L & N Railroad. In either case, the grain is shipped from Kansas City to Chattanooga on a bill of lading showing Chattanooga as the destination and the delivery is completed when the barge or car is placed for unloading at the dealer's elevator or mill. The difficulty arises when he wishes to reship to Orangeburg, South Carolina, over the Southern Railroad at a later date. If the grain came in by rail, he can surrender his inbound bill of lading and ship either the grain, or the grain products into which it has been manufactured, from Chattanooga to Orangeburg for 16 cents per hundredweight. If the grain was brought in by barge, however, he must at present pay a rail rate of 54 cents for the movement from Chattanooga to Orangeburg, and the savings on the inbound barge transportation are thus destroyed.[9]

Under the level of rates prescribed by the Commission's latest order, the evidence of record indicates that the ex-barge rate from Chattanooga to Orangeburg would be reduced from 54 cents to 35.5 cents. The discrimination against Arrow would thus become less severe but it would not be eliminated. Even more serious from the point of view of the barge line is the Commission's refusal to recognize its right to the equality of treatment under section 3(4) which it has been seeking to establish for eight years in this litigation.

In denying relief under section 3(4), the Commission reaffirmed the following finding in its report of March 19, 1958:

"The second phase of the complaint attacks the local rail rates which apply on ex-barge grain from ports on the Tennessee River to points in the South. Respecting this phase, section 3(4) is not in issue because no rail proportionals are published from those ports to the South. [303 I.C.C. at 471]"

In its most recent report the Commission granted relief under section 3(4) to those barge lines serving Ohio and Mississippi River ports where the rail rates are published as separately established proportional rates. The Commission thus bases its denial of relief under section 3(4) to plaintiffs on the fact that the rail rates through the Tennessee River ports are published as single-factor through rates rather than separately established proportional rates as at the Ohio and Mississippi River ports. The effect of the Commission's decisions is that the railroads may freely vary the charges for ex-barge and ex-rail reshipments, as long as they do so by means of unpublished divisions of a through rate rather than published proportional rates. Therefore, unless Arrow obtains a decision on the 3(4) issue, which was squarely presented both to the Commission and to this court, it will have simply won a skirmish on a side issue (sec. 3 (1)) and may yet face years of litigation as the railroads abandon the use of proportional rates for the cover of divisions.

The differences upon which the Commission finally rests its holding is one of the form in which the rates are published, but the decisions of the Supreme Court in Mechling and Dixie Carriers make it abundantly clear that carriers cannot hide their discrimination against ex-barge traffic behind the veil of a through rate any more than they can charge a higher proportional rate on ex-barge than on ex-rail traffic. The thrust of the Mechling-Dixie rationale goes much deeper than form—it makes clear that Congress imposed a duty upon the Commission to eliminate discrimination in whatever guise or form it exists. As

---

9. The difference between the 54-cent local rate and the 16-cent "transit balance" is not necessarily the measure of the discrimination. The Southern receives as compensation for hauling the ex-rail grain a "division" of the through rate from Kansas City to Orangeburg which may be more or less than the transit balance, making whatever adjustment with the L&N as is necessary.

stated by the Supreme Court in Mechling:

"* * * Congress left the Commission no discretionary power to approve *any type of rates* which would reduce the 'inherent advantage' of barge transportation *in whole or in part.*" 330 U.S. at page 579, 67 S.Ct. at page 900, emphasis added.

■■ It is immaterial to the question of discrimination whether the compensation a carrier receives on ex-rail traffic is in the form of a separately established proportional rate, or a division of a through rate. In either event the yardstick for measuring discrimination against ex-barge traffic is the compensation received by the outbound rail carrier on ex-rail traffic from the same port to the same destination. This is not to suggest that the division received by the outbound railroad on ex-rail traffic necessarily establishes the exact rate at which ex-barge traffic must be handled. We simply hold that the fact that the inbound carrier is a barge line rather than a railroad is not a factor which may properly be considered in fixing the charge for the outbound rail movement and that the divisions received on ex-rail movements are *prima facie* evidence as to what charge should be assessed upon ex-barge movements.[10] The plaintiffs attempted to show the divisions received by the railroads on ex-rail traffic, but the Commission refused to receive the evidence. In this the Commission erred. Dixie Carriers v. United States, supra.

The contention is advanced with apparent seriousness by some of the intervening defendants that Arrow is not a connecting carrier in relation to the railroads which serve the Tennessee River ports. This argument is wholly without merit. At each of the Tennessee River ports there are facilities by which grain can be transferred directly from barges into rail cars, but the normal type of transfer is through an elevator. We hold that Arrow is a connecting carrier of the outbound rail carrier when it delivers grain in its port-to-port service to a river elevator or other unloading facility which has a rail connection for the subsequent reshipment of that grain. Nothing more was shown in Mechling [11] or exists at Memphis, and, in our opinion, nothing more was intended by Congress in amending section 3(4) of the act.[12]

10. The Supreme Court in Mechling held that a showing of additional costs on ex-barge traffic was necessary to justify a differential between ex-barge and ex-rail charges. The railroads submitted cost evidence in this proceeding in an attempt to justify such a differential but the Commission rejected this evidence. See also Tennessee Valley Authority v. United States, D.C.N.D.Ala.1951, 96 F. Supp. 409.

11. In its report in Mechling the Commission described the barge movement as follows:

"On grain, the barge carriers perform very little terminal service, such service consisting merely of placing the empty barge under the marine leg of the elevator at the river origin and the loaded barge under the marine leg of the terminal elevator at the gateway. Federal has a terminal at Chicago where it can transfer the products to cars. It can transfer grain from barge to cars at this terminal by means of clamshell, but is never called upon to do so. Mechling handles bulk grain only and does not own or operate a terminal or other transfer facility at Chicago. Thus, the barge service under the grain rates consists solely of towing the loaded barge from point of loading to point of unloading." (Grain Proportionals, Ex-Barge to Official Territory, 262 I.C.C. 7, 19 (1945)).

12. Congress, in the Transportation Act of 1940, amended section 3(4) of the pre-existing act specifically to include water carriers such as Arrow within the definition of connecting carriers. Section 3(4) now reads as follows:

"All carriers subject to the provisions of this chapter shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines and connecting lines, and for the receiving, forwarding, and delivering of passengers or property to and from connecting lines; and shall not discriminate in their rates, fares, and charges between connecting lines, or unduly prejudice any

■ The contention has been advanced by the intervening railroads that before relief can be granted there must be either a finding by the Commission that through barge-rail routes exist via the Tennessee River ports or a finding under section 15(3) of the act that the public interest requires that they be established. Section 6(11)(b) of the act, which authorizes the Commission to establish proportional rates, imposes no such requirement. Moreover, the decision in Dixie Carriers establishes that if relief is necessary to cure a discrimination against water transportation in violation of some other provision of the act, there is no necessity for a finding of public interest under section 15(3). If such discrimination exists, the Commission has a duty to cure it. As stated in Dixie Carriers:

> "The public interest, as defined in the Act, is the guide to the Commission's action. McLean Trucking Co. v. United States, 321 U.S. 67, 82, 64 S.Ct. 370, 378, 88 L.Ed. 544. The policy is to preserve all the 'inherent advantages' of the water carriers" [351 U.S. at pages 60–61, 76 S.Ct. at page 581, 100 L.Ed. 934].

The contention has also been advanced that the plaintiffs are not entitled to relief from the discriminatory rate structure they have attacked because they have not expressly sought joint rates with the railroads, but have merely stated their prayer for relief in general terms.[13] Here again the Commission has failed to recognize the duties imposed

upon it under the Act. While this court will not prescribe the manner in which the discrimination is to be eliminated by the Commission, it is clear that if the Commission deems the establishment of a joint rate for the barge-rail movement rather than ex-barge proportionals to be the appropriate means for ending discrimination, it "has a duty * * * under § 307(d)" to prescribe a joint rate at a level that will preserve intact the "Inherent advantages" of water transportation (Dixie Carriers v. United States, supra, 351 U.S. at page 60, 76 S.Ct. at page 581).

The argument is also made that the existing all-rail rate structure is a finely balanced arrangement under which all producers, markets, and processors have available equal freight rates. It is argued that to grant the relief requested in this case will disrupt the existing rate structure by accentuating the movement of grain on the Tennessee River to the detriment of those interests which cannot take full advantage of the reduced transportation charges made available. The short answer to this argument was made by the Supreme Court in Mechling, as follows:

> "The possibility of such a disruption does not remotely justify discriminations against barge traffic which actually deprive shippers and the barge companies of the inherent advantages of water transportation guaranteed to them by Congress." 330 U.S. at page 580, 67 S.Ct. at page 901, 91 L.Ed. 1102.

connecting line in the distribution of traffic that is not specifically routed by the shipper. As used in this paragraph the term 'connecting line' means the connecting line of any carrier subject to the provisions of this chapter or any common carrier by water subject to chapter 12 of this title." (24 Stat. 380 (1887), as amended, 49 U.S.C.A. § 3(4)).

13. The original complaint before the Commission to which Arrow was a party contained the following prayer for relief:
   "Wherefore, complainants pray that defendants be required to answer the charges herein; that after due hearing

and investigation an order be made commanding said defendants and each of them to cease and desist from the aforesaid violations of said Act, and establish and put in force and apply in the future to the transportation by rail of ex-barge grain between the origins and destinations named or described in paragraphs IV, V, and VI hereinof, in lieu of the rates presently maintained, such other rates as the Commission may deem reasonable, just, non-preferential, non-prejudicial, and non-discriminatory, and that such other and further order or orders be made as the Commission may consider proper in the premises."

When Congress authorized the building of a modern navigable channel in the Tennessee River, it meant for that river to be coordinated with the existing transportation system so as to make its full benefits available to shippers. The Commission has a positive duty to prescribe rates for ex-barge grain which will accomplish that end. Whether the rates are published as proportional rates or as joint rates, the charges paid by the shipper for the movement of ex-barge grain beyond the ports must be on a level which preserves intact the savings on the water leg of the journey, at ports where the inbound and outbound rail carriers are the same, as well as at ports where the inbound and outbound rail carriers are different. The Commission cannot apply the standards applicable to a local movement in determining the reasonableness under section 1 of the ex-barge rates. Likewise, it is prohibited by section 2 from permitting the discrimination between shippers which would result from charging higher rates for the outbound movement to the shipper who receives his inbound grain by barge than apply to the shipper who receives his inbound grain by rail. We construe the Supreme Court decisions in Mechling and Dixie as making unlawful any rate-making device which deprives barge transportation of its rightful place in the National transportation system or which deprives shippers of any part of the economies resulting from the use of barge transportation. We hold, therefore, that the Commission cannot lawfully approve any system of ex-barge rates on grain which deprives shippers of any of the savings of the inbound barge transportation but must prescribe ex-barge rates which will fully preserve the inherent advantages of such barge transportation.

In conclusion, we would be remiss in our duty if we did not take note of the fact that for over eight years plaintiffs have been seeking relief in this proceeding from discriminatory rail rates which we find are in violation of the Interstate Commerce Act. Section 10(e) of the Administrative Procedure Act provides that the reviewing court "shall * * * compel agency action unlawfully withheld or unreasonably delayed." It is the opinion of this court that the present case is an appropriate one for application of this statutory provision, and that the plaintiffs are entitled to prompt relief from the discriminatory rates presently in effect. The case is therefore remanded with instructions to the Commission to enter an order prescribing lawful, reasonable, and nondiscriminatory rates on ex-barge traffic from the Tennessee River ports to destinations in the Southeast in conformity with this opinion.

RIVES, Circuit Judge, and GROOMS, J., concur.